PHILIP W. MORGAN,          )
                             )
      Plaintiff,          )
                             )
        vs.               )     Civil Action No. 10-282
                             )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,    )
                             )
      Defendant.          )

## MEMORANDUM OPINION

### I. INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Philip W. Morgan and Defendant Michael J. Astrue, Commissioner of Social Security. Plaintiff seeks review of the final decision by the Commissioner denying his claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted insofar as he seeks remand for further consideration.

### II. BACKGROUND

#### A. Factual Background

Philip Wayne Morgan was born on July 2, 1989. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Doc. No. 3, "Tr.," at 129.) At age 14, in

September 2003, he developed ventricular tachycardia[1] and underwent ablation[2] at West Penn Hospital in Pittsburgh, Pennsylvania, to help diagnose the cause of the problem. During the procedure he suffered a cardiac arrest, resulting in damage to the coronary artery and aorta. He required CPR in the catherization laboratory and underwent emergency open heart surgery to repair his left coronary artery and replace his aortic valve. (Tr. 178, 183.) Either during or soon after the surgery, Mr. Morgan developed multi-organ failure, including acute renal failure requiring three weeks of dialysis treatment. (Tr. 183.) Prolonged low blood pressure and decreased tissue perfusion resulted in severe ischemia in both legs and compartment syndrome.[3] Mr. Morgan was transferred

---

[1] Ventricular tachycardia is a pulse rate of more than 100 beats per minute, with at least three irregular heartbeats in a row. It can develop as a complication of a heart attack or other heart conditions or without any evidence of heart disease. See the medical encyclopedia at the National Institute of Medicine's website, www.nlm.nih.gov/medlineplus (last visited August 10, 2010), "Medline Plus."

[2] Cardiac ablation is a procedure used to treat heart rhythm problems which cannot be controlled by medication. Small electrodes are placed in the heart to measure its electrical activity. See the medical encyclopedia at Medline Plus.

[3] Ischemia results from blood clots blocking the flow of blood and oxygen to a particular area, potentially resulting in tissue damage, including the death of tissues in the area. Compartment syndrome is the compression of nerves and blood vessels within the fascia separating groups of muscles in the arms and legs from each other. Because fascia do not expand, swelling within each fascial compartment leads to increased pressure on the muscles, blood vessels and nerves in that area. If the pressure is high enough and lasts long enough, the blood flow will be blocked, leading to permanent injury to the muscles and nerves. Severe compartment syndrome may lead to the death of the limb requiring amputation. See the medical encyclopedia at Medline Plus.

to another hospital where his left leg was amputated below the knee. The ischemia also caused nerve damage in his right sciatic nerve and somewhere between 75% and 90% of the muscle of his right leg had to be removed, resulting in ischemic neuropathy[4] in that leg and the loss of the ability to move his foot up and down. (Tr. 184.)

After the surgeries and being fitted with a prosthesis on his left leg and an ankle-foot orthotic on his right leg, Mr. Morgan was able to return to high school. (Tr. 200.) He underwent neuropsychological testing in October 2005 which revealed mild difficulties in the ability to recall complex visual material and in memorization. (Tr. 183-187.) At that time, he was diagnosed with an unspecified cognitive disorder. Further psychological testing and counseling while he was still in high school resulted in diagnoses of post-traumatic stress disorder, adjustment disorder with mixed anxiety and chronic depressed mood, acute stress disorder, and pain disorder. (Tr. 185.) For a short period between September 2006 and February 2007, he participated in a cognitive behavioral therapy program to help alleviate pain and improve his self-esteem and functioning. (Id.)

Although he could no longer participate in sports such as soccer and wrestling at which he had excelled prior to his surgery,

---

[4] Neuropathy is defined as an abnormal and usually degenerative state of the nervous system and also refers to a systemic condition (as muscular atrophy) stemming from a neuropathy. *See* medical dictionary at Medline Plus.

Mr. Morgan was allowed by his cardiologist to engage in a weight-lifting and body-building regime as long as he rigorously maintained a warm-up and cool-down program and limited his lifting to 100 pounds or less. Further neuropsychological evaluations in March 2007 revealed improved scores on visual memory and mental processing tests as compared to previous scores, scores within the average range on all the related tests, and average to above-average intelligence. The psychologists concluded Mr. Morgan would continue to suffer some loss of academic performance due to anxiety and the effects of his medications, but despite some problems with school work, he graduated from high school in 2007. (Tr. 186-197.)

Mr. Morgan began studying at Duquesne University in Pittsburgh where he lived on campus. Although some accommodations were made to ease the transition to college life - such as scheduling classes in the same building to reduce the amount of walking he would otherwise need to do - after three semesters at Duquesne, he dropped out of college. In December 2008, he explained to his long-term treating physician, Dr. Mary Ann Miknevich, that he had made this decision in part because he had difficulty concentrating due to his extensive use of pain medication and in part to work on his efforts in competitive bodybuilding contests. (Tr. 292.)

B.   Procedural Background

On July 26, 2007, Mr. Morgan protectively filed an application for supplemental security income benefits, alleging

4

disability as of September 18, 2003, due to amputation of his left leg below the knee, loss of 75% of his lower right leg muscle resulting in the need to wear a brace, constant nerve and phantom pain, a heart condition related to coronary bypass surgery and valve replacement, ocular migraine headaches, brain injury, depression, flashbacks and nightmares. (Tr. 116.) The Social Security Administration denied Mr. Morgan's application on October 26, 2007, finding that when his ability to work was evaluated, "[a] vocational rule [was] met." (Tr. 81-82; 85-89.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held in Morgantown, West Virginia, on March 5, 2009, before Judge Norma Cannon. Mr. Morgan, who was represented by counsel, testified as did a vocational expert, James E. Ganoe. (*See* hearing transcript at Tr. 56-80.) Judge Cannon issued her decision on April 29, 2009, again denying benefits. (Tr. 19-31.)

The Appeals Council advised Mr. Morgan on January 7, 2010, that it had chosen not to review this decision, finding no reason under its rules to do so. (Tr. 1-4.) Therefore, the April 29, 2009 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). On March 1, 2010, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

**III. STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision

and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[5] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to

---

[5] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(I);

Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).  The

claimant must also show that his income and financial resources are

below a certain level.  42 U.S.C. § 1382(a).

To determine a claimant's rights to SSI benefits,[6] the ALJ

conducts a formal five-step evaluation:

(1)  if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)  if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)  if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)  if the claimant retains sufficient residual functional capacity ("RFC")[7] to perform his past relevant work, he is not disabled; and

(5)  if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

---

[6]  The same test is used to determine disability for purposes of receiving either disability insurance benefits or SSI benefits.  Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under both programs.

[7]  Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations.  Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[8] <u>Sykes v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Cannon first noted that Mr. Morgan had not engaged in substantial gainful activity since July 26, 2007, the date on which he applied for benefits.[9] (Tr. 21.) In resolving step two, the ALJ found that Mr. Morgan's severe impairments included late effects of the amputation of his leg below the left knee, resulting in phantom pain; neuropathic pain of the right lower extremity secondary to the compartment syndrome in that leg; and heart value replacement status post myocardial infarction. (Tr. 21.) She further concluded that Plaintiff's medically determinable mental impairments of mood disorder, post-traumatic stress disorder, and cognitive disorder were non-severe inasmuch as they did not cause more than minimal limitations in his ability to perform basic mental work activities.

---

[8] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. <u>Sykes</u>, 228 F.3d at 263, n.2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-147 n.5 (1987).

[9] In determining eligibility for SSI benefits, the earliest period for which benefits may be granted is the month following the date on which the application was filed. *See* 20 C.F.R. § 416.335. Adult SSI benefits may be awarded to persons age 18 and older who meet the other criteria discussed in the text above.

(Tr. 26.)

At step three, the ALJ concluded that none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any relevant Listing. That is, Plaintiff's amputation did not satisfy Listing 1.05 because although he had experienced some problems with his prosthesis, he was generally able to use the device to ambulate effectively. Similarly, comparing Plaintiff's lower right leg impairment to Listing 1.02 led the ALJ to conclude that although he was required to use a brace and was not able to control his foot without it, he was able to ambulate effectively without use of a hand-held device that would limit his ability to use his upper extremities. Finally, the ALJ concluded that Mr. Morgan's cardiovascular impairment was stable and did not satisfy any of the subsets of Listing 4.00. (Tr. 27-28.)

At step four, the ALJ concluded Plaintiff retained the residual functional capacity

> to perform sedentary work. . .except that he would need to be able to change positions from sitting to standing at least once [every] 30 minutes so that he can stand for a few minutes to relieve discomfort. He should never balance or climb, and should only occasionally stoop, kneel, crouch and crawl. He should avoid all exposure to extremes of heat and cold and hazards such as moving and dangerous machinery.

(Tr. 28.)

At the hearing, the vocational expert, Mr. Ganoe, testified that there were jobs Plaintiff could perform such as general office clerk, addresser/stuffer and bench worker, all of which met the

10

criteria set out in the ALJ's residual functional capacity
assessment. (Tr. 31; *see also* Tr. 76-77.) Therefore, based on
Plaintiff's age, education, ability to communicate in English, work
experience and residual functional capacity, Judge Cannon concluded
Mr. Morgan had not been under a disability and was not entitled to
benefits at any time between July 26, 2007, the date on which his
application was filed, and the date of her decision. (Tr. 31.)

B.    Plaintiff's Arguments

Plaintiff raises four arguments in his brief in support
of his motion for summary judgment. First, he argues that the ALJ
erred by determining that his chronic left stump pain, cognitive
disorder, depression, and post-traumatic stress disorder were not
severe impairments. (Brief in Support of Plaintiff's Motion for
Summary Judgment, Doc. No. 6, "Plf.'s Brief," at 9-13.) Second,
the ALJ made "a bare conclusory statement" rejecting the
credibility of Plaintiff's subjective complaints rather than the
clear and specific findings required by the regulations. (Id. at
13-15.) Third, the ALJ erred by rejecting the opinions of Mr.
Morgan's treating physicians, specifically Drs. King, Blatter, and
Miknevich with regard to Plaintiff's residual capabilities. (Id.
at 15-17.) Finally, Plaintiff argues that the Appeals Council
erred in failing to take into consideration new and material
evidence provided in the form of a report dated March 18, 2009,
from Dr. Richard Paul Bonfliglio and updated neuropsychological

11

testing.  (Plf.'s Brief at 17-18.)

Because we are unable to determine from the text of the ALJ's opinion (1) what medical evidence was used to support her conclusions regarding Plaintiff's credibility and his allegations of debilitating pain or (2) what weight she gave to the opinions of Plaintiff's physicians, particularly his long-term treating physicians Dr. Keller and Dr. Miknevich, we will remand for further clarification and need not address the other arguments raised by Plaintiff in his brief.

C.  Analysis

Before discussing Plaintiff's arguments, we summarize the medical evidence from mid-2006 through early 2009 concerning his subjective complaints.

1.  *Medical  evidence  from  Plaintiff's  treating physicians:*  Mr. Morgan's cardiologist was Dr. Bradley Keller from the Heart Center at Children's Hospital of Pittsburgh.  His reports primarily take the form of letters to Plaintiff's primary care physician, Dr. Mark M. Blatter.  Understandably, Dr. Keller's letters concentrate on Mr. Morgan's heart condition, which stabilized and did not cause any significant ongoing problems,[10] but there are repeated references to chronic pain and headaches.  In

---

[10]  This is not to say that Plaintiff's heart condition was not serious or that the ALJ erred in her consideration of this impairment. However, Plaintiff's arguments focus on his subjective complaints and therefore the Court will do likewise.

October 2006, for instance, Dr. Keller noted occasional headaches with visual field changes which he found consistent with migraine. (Tr. 200-202.) He also mentioned headaches in September 2007, where it was noted that Plaintiff's infrequent migraine headaches occasionally responded to his usual pain medication, but sometimes simply required rest in order for him to recover. (Tr. 316-317.) By November 2008, Mr. Morgan was reporting migraine headaches at the rate of one or two a month. (Tr. 311.)

Dr. Keller's notes reflect that while Mr. Morgan was in high school, his academic work progressed well, although his performance was not the same as prior to his surgeries in September 2003. (Tr. 200-202.) However, after he began attending Duquesne University in the fall of 2007, the medical record reflects increasing problems with pain. For instance, Dr. Keller wrote in March 2008, that

> Philip has significant problems with night time phantom pain which makes [it] very difficult for him to sleep through the night. This has been exhausting to Philip and also extremely stressful for his parents. . . . It is clear that Philip's major issue[s] at this time. . . relate to his chronic phantom and post-ischemic limb pain as well as pain in his right leg. Philip is reluctant to advance the use of narcotics to suppress the pain due to concern of dependence.

(Tr. 314-315.)

In August 2008, Dr. Keller further noted:

> Philip's ongoing issues continue[ ] to be significant chronic phantom pain, which requires Neurontin 900 mg

three times a day and Endocet three times per day.[11]
Philip continues to be significantly impaired in terms of
his physical activity due to his chronic pain, and this
has resulted in significant depression which has impacted
his college experience as well as his physical activities
over the summer time. . . .Remainder of the review of
systems is notable for occasional headaches and vision
problems as well as occasional joint pains. . . .I will
also see if I can identify [an] additional referral for
chronic pain for Philip and his mother as clearly this
has become the most important aspect of his medical
management.

(Tr. 312-313.)

Mr. Morgan's other long-term treating physician was Dr. Mary
Ann Miknevich, Chief of the Amputee Clinic at Mercy Hospital in
Pittsburgh. Between August 2006 and December 2008, Dr. Miknevich
examined Plaintiff some 12 times. With one exception, the notes
from each of those visits refer to Plaintiff's chronic pain. At
various times, Mr. Morgan attempted to reduce his dosage of either
Endocet or Neurontin because he was reluctant to become too
dependent on these drugs. However, each time his dosage was
reduced, he experienced break through pain or the inability of the
current dosage to "hold him through the day." (See, e.g., Tr. 176,
178-180, 217, 219, 221-222, 303.) Not only was he reluctant to try
stronger medications, ongoing treatment for his cardiac condition

---

[11] Among its uses, gabapentin (brand name Neurontin) is used to
reduce pain such as neuropathy, sometimes in conjunction with other
drugs. Endocet is a brand name for a combination of acetaminophen and
oxycodone, used to treat moderate to severe pain. Oxycodone is a
narcotic analgesic and acetaminophen a less potent pain reliever that
increases the effects of oxycodone. See drugs and supplements entries
at Medline Plus.

14

complicated his other options for pain management such as spinal stimulation or use of a TENS unit.[12]

Like Dr. Keller, Dr. Miknevich noted the effect attending college had on Plaintiff's pain and general well-being. She had noted in the spring of 2007 when Plaintiff was completing his senior year of high school that with the addition of an analgesic cream to use on his left stump, his combination of Neurontin and Endocet was sufficient to help him manage his pain and, in fact, he had been able to engage in some sports activities with his friends. (Tr. 176, 214.) By December 2007, at the end of his first semester at the university, Dr. Miknevich noted that "the Endocet does not seem to be holding him completely through the day." Although they discussed increasing the dose or the frequency, Mr. Morgan was "very reluctant to consider this." (Tr. 303.) In March 2008, Mr. Morgan reported continued phantom pain

> which has not been as responsive to his current medication regimen. He has been noting some episodes where even touching another part of his body will cause shooting phantom pain in the left stump. He also notes that on his heavier class days his Endocet does not seem to be holding him as well. He has remained reluctant to go to four per day but was willing to consider utilizing three Endocet per day on most days with four on Tuesday and Thursday (his heavier class days.)

(Tr. 297.)

---

[12] A transcutaneous electrical nerve stimulator or "TENS unit" is a device which electrically stimulates the skin to relieve pain by interfering with the neural transmission of signals from underlying pain receptors. *See* medical dictionary at Medline Plus.

On June 11, 2008, Mr. Morgan reported to Dr. Miknevich that he had completed his first year of college with a respectable 3.1 grade average. But, she commented, "He continues to note problems with phantom pain which he states has been unresponsive to his Neurontin and Endocet," and that he had been "having significant difficulty sleeping secondary to his pain." (Tr. 295-296.) In September, Dr. Miknevich noted that Plaintiff had undergone a neuropsychological evaluation which revealed evidence of "significant depression," much of which he and his mother attributed to "the amount of pain he continues to have." (Tr. 293-294.) At a routine check-up in December 2008, shortly after Plaintiff had completed his third semester at the university, Dr. Miknevich noted, "[I]n just the short time that he has been off from school, he has been able to manage his pain with no more than the 3 Endocet per day." (Tr. 292.)

Finally, on March 3, 2009, Dr. Miknevich wrote a summary letter regarding Mr. Morgan's conditions. She opined:

> his course [of treatment] has been complicated by both phantom limb pain as well as chronic neuropathic pain for which he required ongoing use of opioid pain medication (duralgesic patch and endocet as well as neurontin.) Due to his history of cardiac arrhythmias, he is limited in terms of the type of medication he can use and is unable to take traditional anti-depressant medications. He suffers from post-traumatic stress disorder and depression and has undergone psychological counseling in the past which he did not find beneficial. He is limited in his ability to walk, sit or stand for any prolonged periods of time due to pain. He fatigues easily and finds it difficult to concentrate due to both the pain and depression as well as the timing of his medications.

16

In view of his ongoing problems, it is my medical opinion
that Philip is unable to perform any substantial gainful
employment on a regular routine full-time or part-time
basis and as such he is totally and permanently disabled
from all productive work. This disability is considered
long term and permanent.

Tr. 345.)

In February 2008, Dr. Miknevich had arranged for Mr. Morgan to

consult with Dr. Greg Weidner, a pain management specialist.    She

advised Dr. Weidner that Mr. Morgan and his parents were reluctant

to use a longer-acting or stronger narcotic and, due to his cardiac

condition, questioned the feasibility of using an implanted

stimulator or Baclofen pump.[13]   (Tr. 301.)

Dr. Weidner examined Plaintiff on April 16, 2008, and wrote to

Dr. Miknevich that despite "a high dose of Neurontin as well as

Endocet twice a day," he continued to have pain, difficulty with

sleep, and "an exacerbation of pain when he was under stress at

school."   He continued,

The pain seems to interfere with daily activity as well
as schoolwork.   His parents are very concerned with him
being on medications and are looking to see if there are
any other options available to the patient. . . .He has
been working with a psychologist in an effort to deal
with what appears to be a post traumatic stress disorder.
. . . He does not have any significant stump pain.   What
troubles him the most is the phantom sensation. . . . He

---

[13] Baclofen is a drug that works on as a muscle relaxant to
relieve chronic pain by inhibiting transmission at the spinal level
and depressing the central nervous system.   It can be taken orally or
by use of an implanted drug delivery system, i.e., a pump.    *See*
American Chronic Pain Association Consumer Guide to Pain Medication &
Treatment at
http://www.theacpa.org/documents/ACPA%20Consumer%20Guide%202010%200104
10.pdf, last visited August 17, 2010.

is very concerned, as are his parents, regarding his
ongoing pain, and yet they are very concerned about any
possible complications of any invasive efforts obviously
given his history.

(Tr. 282-283.)

Dr. Weidner discussed other medications such as methadone and

Lyrica as an alternative to Neurontin, both of which Plaintiff's

parents were reluctant to consider due to other side effects.  They

also discussed spinal cord stimulation, also rejected by Mr. Morgan

and his parents, and finally decided to pursue acupuncture and use

of a TENS unit despite possible concerns about interactions with

his heart.  (Tr. 282-283.)

Plaintiff's other physicians included Drs. Mark Blatter and

Edwin King who practiced with a group known as Pediatric Alliance.

Dr. Blatter had apparently been Plaintiff's pediatrician and

primary care physician from shortly after he was born in July 1989,

through at least October 12, 2006. (Tr. 246.)  While his treatment

focused on such matters as routine check-ups and flu shots, it is

clear from the record that most of the evidence pertaining to Mr.

Morgan's claimed impairments was provided to Dr. Blatter by

Plaintiff's other physicians.  (See, e.g., statements at Tr. 247,

referring to reports from Dr. Miknevich, and at Tr. 253, indicating

that much of the information sought in a questionnaire provided by

the Social Security Administration to Pediatric Alliance was not in

its own medical records.)  It is equally clear that Dr. Blatter,

and presumably his colleague Dr. King, received copies of letters

18

on a frequent basis from Mr. Morgan's cardiologist, Dr. Keller, which repeatedly referred to Plaintiff's chronic pain. (Tr. 306-317.) Dr. King completed a form entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" on August 28, 2007, in which he referred numerous times to limitations on Mr. Morgan's abilities due to his chronic pain. (Tr. 254-255.)[14]

2. *Other evidence concerning subjective complaints:* Sometime between the fall of 2007 when he began college and the hearing in March 2009, Mr. Morgan completed an updated disability report. (Tr. 141-147.) At that time, he reported he was taking five drugs daily, three to manage his heart-related problems and Endocet and Neurontin for pain. Enalapril which he took to reduce his blood pressure caused increased tiredness and his pain medications caused drowsiness and fatigue. (Tr. 144.) He also reported that after he began attending university classes, he experienced increased nerve and phantom pain, problems handling college-level calculus, and prosthesis-related conditions due to increased walking. (Tr. 142.) He further noted that after he began college, the nerve pain in both legs, phantom pain, number of skin breakdowns, and frequency of migraines had all increased.

_____

[14] Plaintiff also underwent a neuropsychological evaluation at the Watson Institute on March 29, 2007. (Tr. 181-195.) Because the references to pain and fatigue in that report are largely cumulative of the more detailed reports by Drs. Miknevich and Keller, we have referred to the Watson Institute report only in passing.

(Tr. 145.)

At the hearing, Plaintiff testified that:

- His pain "increased drastically" between his freshman and sophomore years at the university, the medicine he was taking to help control the pain caused his grades to suffer because he could not focus, and he missed "several classes a week" because the pain was "uncontrollable at the time." (Tr. 62-63.)

- Pain medications and the medications he takes for his heart condition make him very tired. (Tr. 66-67.)

- During classes at the university, he would find himself "losing focus" and was not able to "concentrate fully." He would "drift off from being so tired" and "a lot of the time" could not go to class. (Tr. 68.)

- If he exercises at the gym, the next day he has "a very hard time getting up in the morning" and he lies on the couch "for several hours late into the afternoon." (Tr. 69.)

- He experiences chronic nerve pain in both legs, requiring him to lie down or nap for "probably ten" of the 12 hours a day he is awake; cold and wet weather increases his phantom pain and the nerve pain to the extent he must take an additional pain pill; he cannot fall asleep because of phantom pain or "jumping" in his legs which is not alleviated by pain medication. (Tr. 70.)

- He is fatigued by almost any activity. (Tr. 70.)

- Activities such as playing computer games is done lying down and after an hour, he starts to "lose focus" and gets anxious and irritated. (Tr. 71.)

- Approximately three times a month he gets ocular migraine headaches which cause tunnel vision for 30 to 40 minutes. If he can, he takes an extra pain pill to help keep the migraine pain from increasing, and lies down for three and a half to four hours. (Tr. 72.)

- Walking more than a hundred yards causes the stump on his left leg to become sore and increases phantom pain in his leg. (Tr.72.)

20

- Standing is limited to about 10 minutes and sitting to 25 to 30 minutes before he begins to get uncomfortable. (Tr. 72.)

- In addition to medication, to alleviate his pain he takes hot showers, uses a heating pad, elevates his legs or sleeps for a while. (Tr. 73.)

- He is awake three to four times a night, waking up due to nerve pain and requiring him to nap the following day. (Tr. 73.)

3. *The weight given by the ALJ to the medical evidence from Plaintiff's physicians:* We begin with the question of how the ALJ considered the opinions of Plaintiff's physicians since that evaluation influences the outcome of her other analyses. Social Security regulations identify three categories of medical sources -- treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source. Non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. § 416.902.

The regulations also carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 416.927. In

general, every medical opinion received is considered. Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 416.927(d); *see also* <u>Mason v. Shalala</u>, 994 F.2d 1058, 1067 (3d Cir. 1993) (it is well-established that an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all.") The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(d)(2). The term "medical opinions" is defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the

claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

In this case, we have three categories of physicians. Drs. Miknevich, Keller and Blatter (along with his colleague Dr. King) were Plaintiff's treating physicians. Non-treating sources include Dr. Weidner, the one-time consulting physician, and Drs. Christy Emmons Basista, Sharon Arffa, and Lindsy K. Wagner, who conducted neuropsychological testing at the Watson Institute on two occasions.[15] The non-examining state-agency sources were Dr. Alfred Mancini and Dr. Phyllis Brentzel, who reviewed, respectively, Plaintiff's medical and psychological treatment records.

Beginning in reverse order of weight to be given to medical opinions, we note that the ALJ did not explicitly mention, even in passing, the reports by Dr. Mancini (Exhibit 11F, Tr. 258-264) and Dr. Brentzel (Exhibit 12F, Tr. 265-277.) It is therefore impossible to determine what weight, if any, she gave to their

---

[15] Only the report of the first examination was considered by the ALJ. The second report (Tr. 236-361) was issued August 13, 2008, well before the dates of the hearing, but it is unclear from the record why this report was not presented as part of the medical record before the ALJ. Another one-time consulting physician was Dr. Richard Paul Bonfiglio, a specialist in physical medicine and rehabilitation, who examined Plaintiff on March 18, 2009, immediately after the hearing but before the ALJ issued her findings. (Tr. 362-394.) Again, the record is unclear why this report was not timely presented to the ALJ. Because this evidence was not provided to her, this Court will not consider it in its analysis. *See* Fricker v. Halter, No. 01-1361, 2002 U.S. App. LEXIS 915, *5-*6 (3d Cir. Jan. 3, 2002).

conclusions. The neuropsychological evaluation performed on March 29, 2007 (Tr. 181-195) by Drs. Basista and Arffa is discussed at length in the ALJ's opinion (Tr. 25-27), but the ALJ never states what weight she gave to the medical conclusions in that report. Similarly, although Dr. Weidner's report of April 16, 2008, is accurately summarized (Tr. 24), there is no indication of the weight given to his medical opinions regarding the extent of Plaintiff's pain. Dr. Weidner is a specialist in pain management, a factor which plays a decisive role in the analysis of Mr. Morgan's subjective complaints of debilitating chronic pain. Although he examined Plaintiff on only one occasion,[16] because of his area of specialization, his opinions should have been entitled to enhanced weight, albeit less than that of a long-term treating physician.

The ALJ did not refer to Dr. Blatter's records, *per se*, but indicated she did not give Dr. King's opinion "significant weight" because it "was not consistent with the objective medical signs and findings and the claimant's own reports to his physicians regarding his activities and capabilities." (Tr. 30.) The Court is unable to determine from her decision what "objective medical signs and findings" she found inconsistent with his conclusions since all the other physicians involved in Plaintiff's care similarly refer to

---

[16] Dr. Keller noted in a letter dated August 19, 2008, that apparently Plaintiff and his mother did not appreciate Dr. Weidner's bedside manner. (Tr. 312.)

24

chronic pain in both lower extremities.

Dr. Keller was clearly a long-term treating physician. Although the ALJ summarized his medical findings, including his report of occasional headaches and the fact that Mr. Morgan had reported "significant problems with nighttime phantom pain" that interfered with his sleep, there is no indication of the weight she gave to his other comments such as his reference in March 2008 to Plaintiff's "chronic phantom and post-ischemic limb pain as well as pain in his right leg" as his "major issues" or the comment in August 2008 that "Philip continues to be significantly impaired in terms of his physical activity due to his chronic pain, [resulting] in significant depression which has impacted his college experience as well as his physical activities over the summer time." In the section of her analysis which summarizes the opinion evidence (Tr. 29-30), the ALJ does not mention Dr. Keller's report at all.

Finally, Dr. Miknevich was Plaintiff's long-term treating physician for his most serious conditions and a specialist in problems associated with amputations. The ALJ noted Dr. Miknevich's numerous references to on-going pain in both lower extremities, the fact that when Plaintiff attempted to attend university classes, his pain level increased to such an extent that he increased his dosage of Endocet on his heavier class days, difficulty sleeping due to pain, and the fact that after he stopped attending classes, his pain level again decreased. The ALJ noted

25

specifically Dr. Miknevich's letter report of March, 3, 2009, and

commented:

> While her opinion that the claimant is disabled is an
> opinion on an issue reserved to the Commissioner[17]. . .,
> the undersigned has considered her opinion that the
> claimant is unable to perform prolonged walking, sitting
> or standing. However, the objective medical evidence
> indicates that the claimant is able to sit for at least
> 30 minutes at a time with short breaks for standing (as
> he demonstrated during the hearing and by his ability to
> sit through college classes, which presumably last for at
> least 50 minutes at a time. The undersigned finds that
> the objective medical evidence supports a finding that .
> . . his activities as reported to his treating physicians
> indicate that he is not as limited as was found by Dr.
> Miknevich.

(Tr. 30.)

As noted above in the quotation from her letter of March 3,

2009, Dr. Miknevich opined about much more than Plaintiff's ability

---

[17] We do not disagree with the ALJ's comments about Dr.
Miknevich's conclusion that Plaintiff was "unable to perform any
substantial gainful employment on a regular routine full-time or
part-time basis," was "totally and permanently disabled from all
productive work," or that his disability was "long term and
permanent." Social Security Administration rules distinguish between
medical opinions about the nature and severity of a claimant's
impairments, symptoms, diagnosis and prognosis, what the claimant can
still do despite impairments, and physical or mental restrictions on
the one hand, and medical opinions on matters reserved for the
Commissioner on the other. It is well-established that conclusions on
certain issues - including whether a claimant is "able to work" or is
"disabled" - are reserved to the Commissioner and opinions from
medical sources on those issues are not entitled to controlling
weight. *See* "Medical Source Opinions on Issues Reserved to the
Commissioner," SSR 96-5p and Smith v. Comm'r of Social Sec., No.
05-3533, 2006 U.S. App. LEXIS 10896, *15 (3d Cir. May 1, 2006). On
the other hand, the rules also provide that "adjudicators must always
carefully consider medical source opinions about any issue, including
opinions about issues that are reserved to the Commissioner. . . .
[O]pinions from any medical source on issues reserved to the
Commissioner must never be ignored." SSR 96-5p; *see also* Summerville
v. Astrue, CA No. 07-842, 2008 U.S. Dist. LEXIS 38412, *30-*31 (W.D.
Pa. May 8, 2008).

26

to walk, sit or stand for prolonged periods of time. She also commented on the ongoing use of opioid pain medications, his psychological impairments and his inability to take traditional anti-depressants because of his heart condition, and the effects of pain, fatigue, and medications on his physical and mental abilities. As Plaintiff's physician for more than three years and a specialist in treating amputees, her opinions are entitled to great, if not controlling, weight inasmuch as they can be considered to reflect "expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; see also 20 C.F.R. § 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.") In addition, Dr. Miknevich's summary opinion is consistent with not only her own notes, but with the notes of Dr. Keller, for example, his comments regarding Plaintiff's "major issues" of chronic phantom and post-ischemic limb pain and the fact that his physical activities, college experience, and mental condition were "significantly impaired" due to chronic pain.

Finally, the only physician who opined that Plaintiff was able to sit for at least 30 minutes with short breaks for standing was Dr. Mancini, the non-examining state agency physician whose review in 2007 was based on an incomplete medical record which did not

reflect the changes in Mr. Morgan's condition after he began attending university classes. While the ALJ is entitled to note her own observations during the hearing, as she did when referring to Plaintiff's ability to sit through the hearing[18] and his presumed ability to sit through 50-minute university classes, this statement itself is not objective medical evidence. *See* Morales, 225 F.3d at 318, stating that an ALJ may not reject a treating physician's opinion with nothing more than her "own credibility judgments, speculation or lay opinion."

Giving the opinion of a treating physician great weight – especially when that opinion reflects expert judgment derived from caring for the patient over a prolonged period of time – is considered a "cardinal principle guiding disability eligibility determinations." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), *quoting* Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987). The ALJ must weigh conflicting medical evidence and can choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d at 317. In short, an ALJ may not reject a treating physician's opinion on a *medical* question unless he identifies the contradictory medical evidence in the record on which he relies. Burnett v. Commissioner of SSA, 220 F.3d 112, 121 (3d Cir. 2000) (emphasis added).

---

[18] We note for the record that the hearing lasted just over 40 minutes and that Plaintiff asked if he would be allowed to stand after he finished his own testimony. (Tr. 74.)

28

We recognize that the ALJ here conscientiously and accurately summarized the medical evidence in this record. However, because she failed to explain the weight she assigned to the opinions of Plaintiff's two most significant physicians and failed to identify the medical evidence that contradicted their opinions about the severity of Plaintiff's chronic pain and its effect on his physical and mental abilities, this Court is left with "little choice but to remand for a more comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this Circuit." Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001); see also Burnett, 220 F.3d at 121, remanding in part because the ALJ had failed to "explain his reasons for discounting all of the pertinent evidence before him."

4. *The ALJ's credibility finding with regard to Plaintiff's subjective complaints:* Plaintiff argues that Judge Cannon erred by making "a bare conclusory statement regarding why she was rejecting the credibility of [his] subjective complaints." (Plf.'s Brief at 13.) Relying on Social Security Ruling[19] ("SSR") 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the

---

[19] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

Credibility of an Individual's Statements," he argues her conclusion that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" is insufficient because she did not state why Plaintiff's statements were not credible or how they were inconsistent with medical evidence of record. Nor did she identify specific reasons for rejecting Mr. Morgan's testimony, cite to specific evidence in the file, or explain what weight she gave to his statements. (Plf.'s Brief at 14-15.)

Defendant responds that Plaintiff's argument regarding the insufficiency of the ALJ's credibility analysis must fail because he neglects to read the decision as a whole. When the entire decision is considered, it is clear that Plaintiff's description of his abilities is not consistent with the information in the medical record regarding activities such as golfing, participating in weight lifting and bodybuilding contests, playing sports with his friends, and maintaining good grades in college-level academics. Therefore, the ALJ's conclusion that he could perform a limited range of sedentary work is supported by substantial evidence. (Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 9, at 8-9.)

Social Security regulations clearly describe how the ALJ is to weigh a claimant's subjective complaints of pain, fatigue,

shortness of breath, weakness, or nervousness and assess the claimant's credibility with regard to those complaints. *See* SSR 96-7p. In brief, a claimant's description of his physical or mental symptoms is not sufficient in itself to establish disability. Rather, the ALJ must first ascertain if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the pain or other symptoms. Once such a medically determined condition is identified, the ALJ must evaluate the intensity, persistence, and effects of the claimed symptoms to determine the extent to which they limit the individual's ability to do basic work activities. In this second step, the ALJ must determine the credibility of the claimant's statements based on consideration of the entire record, including medical signs and laboratory findings, the claimant's statements, and information provided by medical sources or other persons regarding the symptoms and how they affect the individual. SSR 96-7p; *see also* 20 C.F.R. § 416.929(c)(4). The regulations further note that an individual's symptoms "can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." 20 C.F.R. § 416.929(c). In those circumstances, the ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of

medication(s) the individual takes to alleviate the symptoms; treatment other than medication received to relieve pain; and any other factors concerning the individual's functional limitations and restrictions due to the symptoms.  Id.

It is well established that conclusions regarding subjective complaints are largely a matter of credibility determination by the ALJ.  As such, they are entitled to great deference and should not be discarded lightly, given her opportunity to observe the claimant's demeanor.  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  However, the ALJ is required to give significant weight to a claimant's subjective complaints and alleged functional limitations when those allegations are supported by competent medical evidence and, in fact, must give "serious consideration" to those complaints even if they are not fully confirmed by the objective medical evidence.  Schaudeck, 181 F.3d at 433; Mason, 994 F.2d at 1067-1068.  Where a claimant's testimony concerning pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount the claimant's pain without contrary medical evidence.  Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985); Chrupcala v. Heckler, 829 F.2d 1269, 1275-1276 (3d Cir. 1987).

This standard is reiterated in SSR 96-7p, which provides that where symptoms

> suggest a greater severity of impairment than can be
> shown by objective medical evidence alone, the

adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record. . . .In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. . . .[T]he adjudicator must. . .give specific reasons for the weight given to the individual's statements.

The same Ruling notes that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." As this Court has previously noted:

The determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001), quoting SSR 96-7p. . . . This Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted.) However, the reviewing court will reject an ALJ's credibility determination only if it is "patently wrong." Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005).

McClinsey v. Astrue, CA No. 08-23, 2008 U.S. Dist. LEXIS 102657, *19, n.13 (W.D. Pa. Dec. 18, 2008).

In this case, we agree the ALJ properly set out the standard by which the Social Security Administration evaluates a claimant's

subjective symptoms and their effect on his functional limitations. (Tr. 28.) She also correctly and completely summarized the medical evidence and Plaintiff's testimony at the hearing, including numerous references to reports of chronic pain. (*See* Tr. 21-25, 28-29.) Nor is there any question that the ALJ recognized the two-step process to be used when evaluating a claimant's symptoms and their effect on the individual's functional limitations. (*See* Tr. 28.) Here, the ALJ determined that the medical evidence established the presence of an impairment – the amputation of his left lower leg and continuing effects of the damage to his right leg and foot – which could reasonably be expected to give rise to the symptoms alleged – that is, chronic phantom pain in his left lower leg and foot and neuropathic pain in his right leg and foot.

As Plaintiff argues, however, the ALJ's analysis breaks down in the second part of the process because there is no consideration of the effect pain, fatigue, side effects of medications, and other subjective complaints might have on his ability to work. Nor is there any substantive discussion of the other seven factors set out in 20 C.F.R. § 416.929(c) which the ALJ is to consider.

In considering Mr. Morgan's subjective complaints, the ALJ mentioned that "while the claimant has reported that his pain and medication side effects have rendered him unable to concentrate and attend, neuropsychological testing indicated that his academic functioning was at the average to high average levels, and he was

34

able to attend college for three semesters." (Tr. 29.) She also concluded that the "objective medical evidence indicates that the claimant is able to sit for at least 30 minutes at a time with short breaks for standing (as he demonstrated during the hearing and by his ability to sit through college classes, which presumably lasted for at least 50 minutes at a time.") She noted Dr. Miknevich's opinion that Mr. Morgan was unable to perform prolonged walking, sitting or standing, but rejected it based on "objective medical evidence," her own observations (his ability to sit at the hearing), and the supposition that he could sit through college classes of 50 minutes.

The critical problem with the ALJ's analysis here is that she failed to identify the "objective medical evidence" which supports it. Although not referred to explicitly by the ALJ, the only medical evidence the Court has been able to identify which contradicts evidence from Plaintiff's treating physicians about the effects of pain, fatigue, and medication is the report by Dr. Mancini, the non-examining state agency physician who reviewed Mr. Morgan's file on October 18, 2007. Dr. Mancini concluded Mr. Morgan could perform sedentary work and had an unlimited ability to push and pull, including with his legs. (Tr. 258-264.) He further noted succinctly, "He reports pain," apparently based on his review of Dr. Miknevich's notes on numerous occasions of chronic phantom pain in his left leg and neuropathic pain in his right leg and

foot.

State agency medical and psychological consultants who review a claimant's medical record are considered

> highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [a claimant is] disabled.

20 C.F.R. § 416.927(f).

Moreover, the state agency physician's conclusions "regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the [ALJ] and Appeals Council levels of administrative review. . . [who] may not ignore these opinions and must explain the weight given to these opinions in their decisions." SSR 96-6p, "Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants."

Given the actual condition of Plaintiff's lower extremities described in the medical record, Dr. Mancini's conclusion that he had unlimited ability to push and pull with his legs should be viewed with considerable doubt. Moreover, his summary was prepared shortly after Mr. Morgan began attending college; therefore, the records he reviewed could not have included evidence that when Plaintiff was participating in full-time activities such as taking college courses, his condition deteriorated, as evidenced by

infection of his left leg due to problems with his prosthesis, increased pain and fatigue, and worsening of his mental impairments. Thus, Dr. Mancini's findings do not present an entirely accurate picture of Plaintiff's residual functional capacity under conditions which might be analogous to the work environment. *See* SSR 96-6p, noting that opinions of state agency consultants can be given weight only insofar as they are supported by evidence in the case record, considering, e.g., the consistency of the opinion with the record as a whole.

With the exception of Dr. Mancini's report, the medical evidence is one hundred per cent consistent - Mr. Morgan experiences chronic severe phantom pain in his left leg and foot and neuropathic pain in his right lower extremity which is exacerbated by regular activity. Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. <u>Smith v. Califano</u>, 637 F.2d 968, 972 (3d Cir. 1981). Furthermore, if, as Defendant argues, Plaintiff did occasionally participate in other activities such as bodybuilding, weight-lifting and attempting to play golf with his friends, such "sporadic and transitory" activities may "demonstrate not his ability but his inability to engage in substantial gainful activity." <u>Smith</u>, <u>id.</u>

The second reason to question the ALJ's credibility analysis is that in this portion of her decision, as in the consideration of

the medical evidence discussed above, the ALJ failed to explain the reasoning underlying her conclusion that his reports were not credible. Simply identifying references to pain in the medical record is insufficient when there is no explanation of why the ALJ concluded the intensity, persistence, and effects of his pain, fatigue and medication side effects would not limit his maximum ability "to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-7p, defining residual functional capacity; *see also* 20 C.F.R. § 416.945. By way of example only, the medical evidence clearly shows that after Mr. Morgan began attending college classes, an activity which might be considered comparable to working on a regular schedule, his pain increased to such a degree that the level of medications he had previously been taking was no longer sufficient to alleviate his pain, causing him to increase the dosage of Endocet on his heaviest class days. The frequency of his migraine headaches increased and he had greater difficulty sleeping. Conversely, soon after he completed his third semester and stopped attending classes, Dr. Miknevich noted that he was able to return to his previous dose of Endocet three rather than four times a day. Despite this evidence, the ALJ failed to provide any discussion of the cause-and-effect relationship between continual physical and mental effort and exacerbation of Mr. Morgan's pain.

As has been recently pointed out in a similar case, if an ALJ

"must give serious consideration to a claimant's subjective complaints even where such complaints are not corroborated by objective medical evidence. . . .it follows a fortiori that serious consideration must be given to a claimant's testimony where such testimony is corroborated by objective medical evidence." Schaffer v. Astrue, CA No. 09-1254, 2010 U.S. Dist. LEXIS 35100, *37 (W.D. Pa. Apr. 9, 2010). Here, the medical evidence, in particular the opinions of Plaintiff's treating physicians regarding the extent and effect of pain on his abilities, substantiates his subjective complaints, but the ALJ failed to identify medical evidence which would refute those opinions or to address Plaintiff's credibility in any more than conclusory fashion. We therefore remand in order to allow the ALJ to explain her reasoning more fully.

## V.    FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Here, we are not convinced that the ALJ's ultimate conclusions

are necessarily incorrect; in fact, upon remand, she may reach the same conclusions. The missing element in this case is the explanation of her reasoning on two critical factors – evaluation of the medical opinions of Plaintiff's treating physicians and of Plaintiff's subjective complaints. We therefore find that this case must be remanded for further consideration consistent with the analysis herein.

An appropriate order follows.

August ___24___, 2010       _William L. Standish_
                            William L. Standish
                 United States District Judge